UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CASEY CLARKSON,<br><br>                    Plaintiff,<br><br>     v.<br><br>ALASKA AIRLINES, INC.,<br>HORIZON AIR INDUSTRIES, INC.,<br>and ALASKA AIRLINES<br>PENSION/BENEFITS<br>ADMINISTRATIVE COMMITTEE,<br><br>                    Defendants. | NO. 2:19-CV-0005-TOR<br><br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT |

BEFORE THE COURT is Defendants' Motion for Summary Judgment (ECF No. 136).  This matter was submitted for consideration without oral argument.  The Court has reviewed the record and files herein, and is fully informed.  For the reasons discussed below Defendants' Motion for Summary Judgment (ECF No. 136) **GRANTED**.  The parties' remaining motions are **DENIED** as moot; the trial and all hearings are **VACATED** as moot.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 1

# BACKGROUND

This matter arises from Plaintiff Casey Clarkson's class action filed against Defendants Alaska Airlines, Inc. ("Alaska") and Horizon Air Industries, Inc. ("Horizon") on January 7, 2019.  ECF No. 1.  The following facts are not in dispute except where noted.  Plaintiff was employed as an airline pilot for Horizon from November 2013 to November 2017, and thereafter was employed by Alaska.  ECF No. 161 at 3, ¶¶ 2–3.  During Plaintiff's employment with both Horizon and Alaska, he was an active member of the Washington Air National Guard.  *Id*. at ¶ 4.  Plaintiff typically performed military duty for approximately 10–12 days per month from November 2013 through June 2018.  *Id*. at 3, ¶ 5.

While employed by Horizon, Plaintiff took the following periods of military leave: June 8–July 8, 2017; September 9–14, 2017; and October 1–26, 2017.  *Id*. at 56, ¶ 97; at 56–57, ¶¶ 99–102.  Before taking military leave in June 2017, Plaintiff was employed as a turboprop Captain; upon return from leave in July 2017, Plaintiff was once again employed as a turboprop Captain.  *Id*. at 56, ¶ 98.  There is no evidence in the record that Horizon employed Plaintiff in any position other than a turboprop Captain during the relevant time period.

For each of the months Plaintiff took military leave while employed by Horizon, he received 2.45 flight credit hours per day for each day he was on leave pursuant to Horizon's Virtual Credit policy, which was implemented in May 2017.

*Id.* at ¶ 97; at 57, ¶¶ 99–102.  The Virtual Credit policy applied to all forms of leave, military or otherwise.  ECF No. 161 at 56, ¶ 97.  Plaintiff's virtual credits were combined with his earned credits to determine his flight schedules, which were built and assigned using a Preferential Bidding System ("PBS").  *Id.* at 49–50, ¶¶ 91–92.  Plaintiff generated the minimum required credit hours to be assigned a Line Holder schedule for each month he took military leave, with the exception of July 2017; in that month, he was assigned a Reserve schedule.  *Id.* at 58, ¶ 103.[1]

The schedule to which a pilot was assigned was based, in part, on a pilot's ability to meet a certain threshold of credit hours.  *Id.* at 52, ¶ 95.  Line Holder schedules required at least 70 credit hours.  *Id.*  If a pilot could not meet the 70-credit hour minimum, a pilot would be assigned a Reserve schedule.  *Id.*  Pilots assigned to Line Holder schedules fly specific trips whereas pilots assigned to Reserve schedules are on call for specific days.  *Id.* at 28, ¶ 53.  According to the Collective Bargaining Agreements ("CBAs"), a turboprop pilot assigned to a Line Holder schedule was guaranteed a minimum pay of 70 credit hours.  *Id.* at 50, ¶ 93;

---

[1]    Plaintiff claims, without explanation, his Line Holder status for the months of June, September, and October was "of lesser status" than it would have been had he not taken military leave.  ECF No. 161 at 38, ¶ 103.  Plaintiff's assertion is not supported by the record.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 3

1    ECF No. 138-8 at 12.  Reserve schedules were guaranteed a minimum pay of 73

2    credit hours.  *Id*.  In addition to provisions governing scheduling and

3    compensation, the CBAs also governed leaves of absence, specifically for jury

4    duty, sick leave, bereavement leave, military leave, and personal leave, and any

5    compensation awarded during those leave periods.  ECF No. 161 at 4–14, ¶¶ 7–28;

6    49–50, ¶¶ 91–92.

7        The parties dispute whether Defendants' compensation practices for the

8    covered forms of leave, including Horizon's Virtual Credit policy, comply with the

9    Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38

10   U.S.C. § 4301 *et seq*.  Plaintiff alleges Defendants practices violate USERRA by

11   continuing to pay employees who take comparable non-military leave their full

12   wages but failing to pay employees who take military leave their full wages.  ECF

13   No. 31 at 14, ¶ 37; at 16, ¶ 41.  Plaintiff also alleges Defendant Horizon's Virtual

14   Credit policy forced Plaintiff into a lesser status than he held prior to his military

15   leave, thereby denying Plaintiff certain seniority-based rights and benefits that

16   would have accrued but for his military leave.  *Id*. at 15, ¶ 39–40.  Defendants

17   argue they are not required to pay employees who take military leave nor do they

18   provide any rights or benefits to employees who take non-military leave that are

19   not also provided to employees who take military leave.  ECF No. 136 at 7–8.

20

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 4

**DISCUSSION**

## I.    Legal Standard

The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law.  *Id.* at 248.  Further, a dispute is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party.  *Id.*  The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Summary judgment will thus be granted

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## II.   Count IV—Paid Leave Claim

Count IV alleges Defendants fail to provide Plaintiff and other members of the Paid Leave Class the same rights and benefits for military leave that Defendant provides to other employees who take non-military leave in violation of 38 U.S.C. § 4316(b).  ECF No. 31 at 28–29.  Defendants move for summary judgment as to Count IV on the grounds that neither USERRA nor its federal regulations require employers to pay employees who take military leave.  ECF No. 136 at 12.  Specifically, Defendants argue there are no "rights and benefits" as defined by the applicable CBAs that are provided to employees who take non-military leave that are not also provided to employees who take military leave.  *Id*.  Defendants further argue military leave is not comparable to any other forms of leave provided in the applicable CBAs for the purposes of determining entitlement to "rights and benefits" under USERRA.  *Id*. at 18.

Plaintiff asserts employees who take non-military leave are provided the benefit of Loss of Pay protection while employees who take military leave are not afforded the same, resulting in lost wages.  ECF No. 150 at 18.  Plaintiff also argues there are genuine issues of material fact as to whether other forms of non-

military leave are comparable to military leave in terms of duration, purpose, and flexibility. *Id*. at 21–22.

### A.    Rights and Benefits

USERRA provides that a person who is absent from employment due to military service is entitled to the same non-seniority rights and benefits that are generally provided to other employees who take leave as provided in an employment contract, agreement, policy, practice, or plan.  38 U.S.C. § 4316(b)(1)(B).  The statute defines "rights and benefits", "benefit", and "benefit of employment" as:

> the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes . . . vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2).  The Department of Labor ("DOL"), which promulgated final regulations to implement USERRA, further clarified "non-seniority rights and benefits . . . are those that the employer provides to similarly situated employees by an employment contract, agreement, policy, practice, or plan."  20 C.F.R. § 1002.150(a).  The parties dispute the scope of the statute's definition of "rights and benefits."

While this issue is not widely litigated, there seem to be two competing

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 7

1  views among the courts as to whether the definition of "rights and benefits"

2  includes a requirement for paid military leave.  Some courts have found "the

3  definition of 'rights and benefits' under USERRA embraces paid leave."  *White v.*

4  *United Airlines, Inc.,* 987 F.3d 616, 621 (7th Cir. 2021).  Other courts have

5  concluded "the text of the [USERRA] Act unambiguously excludes paid military

6  leave from its definition of 'rights and benefits.'"  *Travers v. FedEx Corp.*, 473 F.

7  Supp. 3d 421, 426 (E.D. Pa. 2020).  The disagreement among the courts centers on

8  statutory interpretation.

9        Both the *Travers* and *White* courts addressed the "rights and benefits" issue

10  on motions to dismiss.  Notably, the *White* court concluded an "important inquiry"

11  for remand was whether the plaintiff could demonstrate that his military leave was

12  comparable to any other leave of absence for which his employer provided paid

13  leave, which would be a question of fact.  *White,* 987 F.3d at 625.  In this case,

14  Plaintiff's claims survived a motion to dismiss because the Court was unable to

15  decide the "rights and benefits" issue without further evaluation of evidence

16  outside the pleadings.  ECF No. 30 at 19–20.  The present motion for summary

17  judgment provides the evidence needed.

18        Here, Defendants argue Plaintiff's claim should be dismissed as a matter of

19  law, following the holding in *Travers*.  ECF No. 136 at 13.  They further argue

20  Plaintiff's claims cannot survive the factual inquiry implied by the *White* court

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 8

because the CBAs do not provide the benefit Plaintiff seeks: the right to receive pay while on military leave.  *Id*.  Plaintiff alleges the benefit is the "Loss of Pay" protection that is provided for other comparable non-military leave.  ECF No. 150 at 18.  Plaintiff argues this protection establishes the continued receipt of wages while on leave, a benefit provided to non-military employees and denied for military employees.  *Id*. at 20.

Both parties' arguments would require the Court to adopt an interpretation of the "rights and benefits" definition.  However, the Court need not make such a determination.  As the *White* court indicated, a factual inquiry as to whether the military leave is comparable to other forms of covered leave is also required for a claim under § 4316(b).  *White*, 987 F.3d at 625; *see also* 20 C.F.R. § 1002.150.  Therefore, the Court will limit its ruling to the facts of this particular case and declines to adopt a specific interpretation of the "rights and benefits" definition.

## B.    Comparable Forms of Leave

The Department of Labor has identified several factors to assist in evaluating whether non-military leave is comparable to military leave.  20 C.F.R. § 1002.150(b).  Those factors include the duration of the leave, the purpose of the leave, and the ability of the employee to choose when to take the leave.  *Id*.  Of those factors, the duration of the leave "may be the most significant."  *Id*.

Here, Defendants argue the other forms of non-military leave covered by the

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 9

1  relevant CBAs—jury duty, bereavement, and sick—are not comparable to military

2  leave.  ECF No. 136 at 18.  Plaintiff alleges there are issues of fact as to whether

3  any of the other non-military leaves are comparable.  ECF No. 150 at 21.

4        *i.*  *Duration*

5       As an initial matter, the parties dispute whether there are distinct categories

6  of military leave.  Defendants argue that neither USERRA nor the relevant CBAs

7  contemplate different categories of military leave based on duration.  ECF No. 136

8  at 23.  Thus, the Court should consider military leave as a general category of

9  leave.  Plaintiff claims that the CBAs and USERRA do, in fact, distinguish

10  between short-term military leave (30 days or less) and long-term military leave

11  (31 days or more).  ECF No. 150 at 24–24.  Therefore, the Court should take more

12  individualized approach and consider each specific military leave period as either

13  long-term or short-term based on its length.  *Id*. at 23.

14       With regard to whether the CBAs distinguish between short-term and long-

15  term military leave, Plaintiff cites to deposition testimony from both Alaska and

16  Horizon representatives, and a Letter of Agreement between Defendants and the

17  pilots' union.  *Id*. at 24–25.  Alaska's representative stated it was her understanding

18  that "short-term leave would be something under 30 days."  ECF No. 150-2 at 19.

19  She went on to say other forms of leave, such as sick and personal, could also fall

20  under the category of short-term leave.  ECF No. 138-2 at 10–11.  Horizon's

representative stated she had seen the term "short-term military leave" on crew

members' schedules, specifically pilots' schedules.  ECF No. 138-3 at 7.  She also

stated there were two different codes used to differentiate between short-term and

long-term military leaves, but she could not recall what the duration difference was

between the two.  *Id*.  Her personal understanding was short-term leave generally

applied to leave of less than a week and anything longer would be considered long-

term leave.  *Id*.  She further clarified there was no policy to differentiate between

general short-term and long-term.  *Id*.  The Letter of Agreement between

Defendants and the pilots' union defines "extended military service" as "a period

of 31 days or more consecutive leave."  ECF No. 150 at 25.

Plaintiff also argues the DOL regulations contemplate a comparison of

individual military leaves by emphasizing the statute's use of "a" and "an" in its

illustrative examples of comparator leaves.  The relevant portion of the statute

states: "For instance, a two-day funeral leave will not be 'comparable' to an

extended leave for service in the uniformed service."  20 C.F.R. § 1002.150(b).

Plaintiff cites to three other sections within USERRA, which include distinctions

between short-term and long-term military leave.  ECF No. 150 at 25.  This is a

curious argument given Plaintiff's advocacy for the *White* holding, which

specifically declined to read unwritten words into a specific statutory provision.

*See White*, 987 F.3d at 624 (declining to compare different but related titles of

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 11

federal law to avoid inconsistency and accepting the language Congress chose when drafting the statute rather than reading "extratextual considerations" into the law).

Finally, Plaintiff cites to caselaw from the Seventh, Fifth, and Federal Circuits to support his position. As the Court previously stated, it is not inclined to apply the Seventh Circuit's *White* holding to this case, as the Ninth Circuit has not yet spoken on the issue. In Plaintiff's Fifth Circuit case, *Rogers v. City of San Antonio*, the court did not reach the issue of comparability under § 4316, but instead remanded the issue for further proceedings. *Rogers v. City of San Antonio*, 392 F.3d 758, 771–72 (5th Cir. 2004). Insofar as the holding contains the phrase "comparable to each plaintiff's military leaves," this Court does not read the phrase so narrowly as to create a particular standard that must be applied when evaluating comparability of leaves. *See id* at 772. Moreover, the following sentence in the holding refers to military leave more generally rather than an individualized analysis. *Id.* (". . . there is a disputable issue as to whether sick leave . . . is comparable to military leave."). The Court reads the holding to be more illustrative of the factual inquiry required for the comparability analysis rather than a particular standard that should be applied.

In *Tully v. Department of Justice* out of the Federal Circuit, a single service member's two and a half year-long leave of absence was held incomparable to the

typically brief duration of absence for court duty, notably because the duration

factor "reflects a significant difference in the *character* of the two forms of leave."

*Tully v. Dep't of Just.*, 481 F.3d 1367, 1371 (Fed. Cir. 2007) (emphasis added).

That court's reference to the "character" of the two forms of leave implies a more

categorical comparison rather than the individualized analysis that Plaintiff would

prefer.  Finally, analyzing military leave durations on an individualized basis

contravenes Plaintiff's own argument on class certification.  *See* ECF No. 73 at

26–27 (stating the comparability factors "do not require individualized

determinations as to specific class members") (citation omitted).  Thus, the Court

finds the more generalized approach the appropriate standard, particularly when

the issue is presented as a class claim.

In support of their comparability arguments, Defendants provided data from

the class period regarding the duration of leaves.  ECF No. 136 at 21–22.

Defendants also provided data for leave frequency with its duration analysis.  *Id*.

Plaintiff objects to the frequency analysis, arguing the DOL regulations compare

only length of leave.  ECF No. 150 at 23.  However, the DOL regulations are not

an exhaustive list.  Furthermore, while the Court agrees duration and frequency are

separate measures, frequency is useful in the duration analysis, particularly in a

class setting.

//

a. <u>Bereavement and Jury Duty Leave</u>

Bereavement and jury duty leave are two categories of leave covered by the CBAs.  ECF No. 161 at 4–14, ¶¶ 7–28.  During the relevant class period, Defendant Alaska's CBA section on Leaves of Absence provided up to seven days for bereavement leave (unpaid or using accrued paid sick days), and Defendant Horizon's CBA provided up to three days of bereavement leave.  *Id.* at 19, ¶ 32.  Defendant Horizon's CBA covers jury duty under Leaves of Absence, while Defendant Alaska's CBA covers jury duty as a separate section.  ECF No. 136 at 20.

The data reflects the short-term duration of both bereavement leave and jury duty.  From October 2008 through December 2020, the longest period of jury duty leave at Horizon (excluding leaves above the 95th percentile of leave length) was five days and the longest period of bereavement leave was three days.  ECF NO. 161 at 25–26, ¶ 47.  The average length of jury duty and bereavement leave at Horizon was four days.  *Id.* at 24, ¶ 44.  From October 2004 through December 2020, the longest jury duty leave at Alaska was six days (excluding leaves above the 99th percentile).  *Id.* at 26, ¶ 48.  The same is true for bereavement leave.  *Id.*

Conversely, the longest military leave at Alaska from October 2004 through December 2020 (excluding leaves above the 99th percentile) was 185 days.  *Id.* at 24–25, ¶ 45.  At Horizon, the longest military leave between October 2008 and

December 2020 was 70 days (excluding leaves above the 95th percentile). *Id*. at 25, ¶ 46. For Alaska, the 90th percentile duration for military leave between October 2004 and December 2020 was nine days. *Id*. at 26, ¶ 49. Only 25 separate bereavement leaves and four jury duty absences at Alaska exceed nine days. *Id*. At Horizon, the 90th percentile duration of military leave between October 2008 and December 2020 was 24 days. ECF No. 161 at 27, ¶ 51. Not a single jury duty absence or bereavement leave exceeded 11 days. *Id*.

Regarding frequency, of the Alaska pilots who took military leave in the relevant class period, the average total number of military leaves was 47 and the average number of military leave days was 511. *Id*. at 23, ¶ 40. Of the Horizon pilots who took military leave in the relevant class period, the average total number of military leaves was 17 and the average number of military leave days was 560. *Id*. at 24, ¶ 43. Conversely, of the Alaska pilots who took jury duty leave, over half only took such leave once. *Id*. at 23, ¶ 41. Of the Alaska pilots who took bereavement leave, over a quarter only took such leave once. *Id*. Similarly, two-thirds of the Horizon pilots who took jury duty or bereavement leave during the class period did so only once. *Id*. at 24, ¶ 44. Plaintiff himself has never taken any jury duty or bereavement leave. *Id*. at 3, ¶ 6. On the other hand, he estimated taking 10–12 days of military leave per month from November 2013 through June 2018. *Id*. at 2, ¶ 5.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 15

b. <u>Sick Leave</u>

Sick leave is another category of non-military leave covered by the CBAs. *Id.* at 44–45, ¶ 76. Sick leave is paid to the extent a pilot has accrued paid sick days to cover the leave of absence; otherwise, sick leave is unpaid. *Id*. at 45, ¶ 78. The longest sick leave at Alaska between September 2013 and December 2020, excluding leave above the 99th percentile, was five days. ECF No. 161 at 46, ¶ 80. During the same timeframe, the longest period of military leave, excluding leave above the 99th percentile was, 122 days. *Id*. at 45–46, ¶ 79. For Horizon, the longest sick leave between February 2010 and December 2020, excluding leave above the 95th percentile, was four days, compared to the longest military leave, excluding leave above the 95th percentile, was 58 days. *Id*. at 46–47, ¶¶ 81–82. The average number of sick days per pilot between February 2010 and December 2020 was 33, compared to an average of 359 days per pilot for military leave. *Id*. at 47, ¶ 83.

Given the significant differences in duration and frequency, military leave is not comparable to jury duty, bereavement leave, and sick leave. *See also Hoefert v. Am. Airlines, Inc.*, 438 F. Supp. 3d 724, 741 (N.D. Tex. 2020) (citing *Moss v. United Airlines, Inc.*, 420 F. Supp. 3d 768, 774 (N.D. Ill. 2019)).

//

//

1

*ii.    Purpose*

2      Defendants argue the purpose of military leave under the CBAs is not

3  comparable to the purposes of other forms of leave under the CBAs because pilots

4  who serve as reservists in the military do so to fulfill a "parallel career."  ECF No.

5  136 at 28.  Plaintiff disagrees, asserting the purpose of military leave is to allow

6  employees to serve the public and to fulfill a public safety function.  ECF No. 150

7  at 29–31.  Plaintiff argues jury duty, bereavement leave, sick leave, and vacation

8  leave also fulfill a public service and public safety function.  *Id*.

9      Very few courts have addressed the issue of leave purposes.  In terms of sick

10 leave, one court found military leave differed in purpose "because military

11 absences are forward looking, whereas sick leave is backward looking."  *Hoefert,*

12 438 F. Supp. 3d at 739.  Stated another way, military leave is provided as the need

13 arises; sick leave is accrued or earned for work already performed.  *Id*.

14 Additionally, the court found sick leave differed because the employer could buy

15 back unused sick days and because sick days were capped at a certain number, but

16 military leave was not.  *Id*.

17     Another court came to a different conclusion regarding an employer's jury

18 duty leave policy.  That court held an employer's *policies* for military leave and

19 jury duty leave were comparable in purpose where the employer provided pay for

20 both types of leave, albeit at different rates; the purpose behind the policies was to

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 17

1    make an employee whole after taking leave.  *See Brill v. AK Steel Corp.*, No. 2:09-

2    CV-534, 2012 WL 893902, *6 (S.D. Ohio Mar. 14, 2012).  However, the court did

3    not address the general purposes of military leave and jury duty leave themselves.

4        Here, the evidence supports Defendants' position that a significant purpose

5    of military leave under the CBAs is to allow employees to pursue parallel careers.

6    Several employees at Horizon and Alaska, including Plaintiff, acknowledged

7    having "parallel careers" was common.  ECF No. 161 at 36–39, ¶¶ 66, 68.  In

8    addition to military careers, other careers included "engineers, consultants, [and]

9    lawyers."[2]  *Id*. at 37–39, ¶ 68.  The ability to pursue parallel careers affords

10   Defendants' employees the opportunity to fulfill other professional careers and

11

12

---

13   [2]    If an employee takes time off to pursue a non-military parallel career, they

14   must use unpaid personal leaves of absence or accrued vacation days.  ECF No.

15   161 at 37–38, ¶ 68.  Plaintiff does not allege personal leave is comparable to

16   military leave.  However, Plaintiff disputes the fact that employees must use

17   personal leave to pursue parallel careers; he asserts they can use sick leave or

18   vacation leave as well.  *Id*.  Vacation days can be used to the extent they have

19   accrued; Plaintiff's citation to the record does not support his assertion that sick

20   days may be used to pursue parallel careers.  *Id*.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 18

earn additional income.  The same cannot be said of the other forms of leave provided in the CBAs.

### a.  Jury Duty

Jury duty is also incomparable to military leave for the same reason.  The purpose of jury duty is to fulfill a compulsory duty to the courts; it is not a parallel career.  *Id*. at 41–42, ¶ 73.  To the extent a servicemember's duty is also compulsory when called to serve, the compensation and frequency of jury duty is not comparable to military leave.  In particular, any compensation provided by the government for jury duty is not comparable to the pay received for military service.  ECF No. 161 at 41–42, ¶ 73.  Under the Horizon CBA, employees who receive compensation from a court for jury duty are required to forfeit the pay to receive their regular salary.  *Id*. at 42–44, ¶¶ 74–75.  Alaska's CBA does not contemplate jury duty under its leaves of absence; rather, it is covered under the CBA's "General" provisions, which indicates Alaska intended to treat jury duty leaves differently than any other forms of leave.  *Id*. at 21, ¶ 37.

### b.  Bereavement Leave

Bereavement leave is not comparable to military leave either in terms of purpose.  The purpose of bereavement leave is to allow an employee time to grieve following the death of a loved one.  ECF Nos. 136 at 29–30; 150 at 30–31.  Granting employees time to grieve, particularly pilot employees, helps ensure they

will be mentally prepared to safely operate an aircraft upon their return to work. ECF No. 161 at 39, ¶ 69.  Plaintiff's argument that this safety concern shares a common purpose with military leave because both serve public interests is attenuated, at best.  ECF No. 150 at 30.

### c. Sick Leave and Vacation Leave

Plaintiff's arguments regarding sick leave and vacation leave fail for the same reason.  A purpose of sick leave is to protect passengers and other employees from illness and to ensure the pilot is mentally and physically fit to fly.  ECF No. 161 at 45, ¶ 77.  Employees take sick leave to recover and rest.  *Id*.  Similarly, employees take vacation leave do so for rest and recuperation to avoid burnout. ECF No. 150 at 31.  The same is certainly not true of military leave, which is physically and mentally demanding.  Again, Plaintiff's attempt to anchor public safety concerns as the comparable function of military leave, sick leave, and vacation leave is unpersuasive.

The significantly different purposes between military leave and other forms of leave covered by the CBAs leave no genuine dispute of material fact as to comparability.

### iii.    Ability to Choose When to Take Leave

Defendants argue the flexible nature of a reservist's schedule supports a finding of incomparability because reservists have the ability, to a certain degree,

1  to choose when to take leave; they do not have such flexibility with other forms of

2  leave.  ECF No. 136 at 24.  Plaintiff argues Defendants overstate the amount of

3  flexibility in a pilot's military duty schedule.  ECF No. 150 at 32.

4  　　　　Pilots at Horizon and Alaska do not work traditional Monday–Friday

5  schedules; instead, they are scheduled to fly certain trips (Line Holder schedules)

6  or are on-call for specific days (Reserve schedules).  ECF No. 161 at 28, ¶¶ 52–53.

7  Their flight schedules are released in advance of each month and they typically end

8  up flying around half the days of any given month.  ECF No. 161 at 28–29, ¶¶ 52–

9  54.  Whether a pilot is scheduled for Line Holder assignment or Reserve

10  assignment depends on the pilot's seniority and bid preferences.  *Id.* at 28, ¶ 54.

11  Pilots submit their bid preferences well in advance of each flying month.  *Id*.  The

12  CBAs require pilots to provide notice of any known absences.  *Id.* at 29, ¶ 55.

13  Defendants' scheduling systems then schedules pilots' flights around those

14  absences.  *Id.* at ¶ 56.

15  　　　　This system of bidding for preferred schedules, paired with the

16  nontraditional work schedule, lends itself well for reservists.  Reservists typically

17  receive their military duty schedules months in advance.  *Id.* at 30, ¶ 58.  To the

18  extent there is any scheduling conflict, pilots can then work with the bidding

19  system and other pilots to ensure their flight schedules for Defendants

20  accommodate their military leave schedules.  *Id.* at 30, ¶ 57; at 31, ¶ 60.  Jury duty,

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 21

1    bereavement, and sick leave tend to occur with little to no notice, which makes

2    advance planning for those leaves more difficult.

3         Additionally, reservists have a certain degree of control over their military

4    duty schedules.  ECF No. 136 at 26.  For example, if a pilot's training flight

5    conflicted with his own squadron, he could switch to a different squadron

6    performing the same training.  *Id*.  Reservists can also work with their military unit

7    scheduler to accommodate scheduling preferences, to a certain degree.  ECF No.

8    161 at 31, ¶ 60.  The degree of flexibility depends on the type of training, nature of

9    the missions, availability of instructors, and other factors.  ECF No. 150 at 32.

10    Jury duty, bereavement, and sick leave do not typically allow for such flexibility.

11    While certain deaths may be foreseeable (e.g., a person suffering a terminal illness)

12    and some medical appointments can be scheduled with flexibility, it is more likely

13    that death and illness will occur unexpectedly.  Similarly, jury duty also arises

14    without significant notice.  While pilots can sometimes be excused from jury duty,

15    they have far less control over that rescheduling process than they do over the

16    process to schedule their reservist and flight duties.  ECF No. 136 at 27.

17         Finally, military leave is automatically granted.  ECF No. 161 at 32–33, ¶

18    61.  This is not true of bereavement, sick leave, and vacation.  Bereavement leave

19    is granted with discretion or may be taken using unpaid personal leave or accrued

20    sick days.  *Id*. at 39–40, ¶¶ 70–71.  Likewise, sick leave and vacation are not

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 22

automatically granted, but can be taken using accrued paid days or by taking unpaid personal leave. *Id.* at 45, ¶ 78; at 47, ¶ 84.

Because pilots have a greater degree of control over their ability to take military leave and schedule around such leave, military leave is not comparable to other forms of leave covered by the CBAs.

Based on the foregoing, there are no genuine issues of material fact as to whether military leave is comparable to other forms of leave covered by the CBAs; they are not comparable. Therefore, Defendants are entitled to summary judgment with respect to Count IV.

### III.    Counts I–III—Virtual Credit Claims

Counts I–III pertain to Defendant Horizon's Virtual Credit policy. Plaintiff seeks relief in his individual capacity for these claims. Count I alleges Defendant's Virtual Credit policy provided Plaintiff with fewer credit hours than he would have received but for his military leave, thereby failing to properly reemploy Plaintiff upon his return, in violation of 38 U.S.C. §§ 4312(a), 4313(a)(1). ECF No. 31 at 23–24. Count II alleges Defendant's Virtual Credit policy failed to treat military leave as continuous employment, thereby denying Plaintiff his seniority-based rights and benefits, in violation of 38 U.S.C. § 4316(a). *Id.* at 25. Count III alleges the application of Defendant's Virtual Credit policy led to Plaintiff's demotion following his return from military leave in violation of 38 U.S.C. § 4316(c). *Id.* at

26.

## A.    Counts I and III

Defendants move for summary judgment on Counts I and III on the grounds that Plaintiff was never "demoted" or "discharged," he has no damages, and because he lacks standing[3] as he is no longer employed by Horizon.  ECF No. 136 at 35–36.  Plaintiff argues the Virtual Credit policy forced Plaintiff to take Reserve schedule status, which he alleges is a lesser position than the Line Holder schedule he previously held, and that Plaintiff was harmed by being forced to work additional hours to achieve Line Holder status.  ECF No. 150 at 40.

USERRA §§ 4312 and 4313 apply at the time a service member returns from military leave and seeks reemployment.  *Butts v. Prince William Cty. Sch. Bd.*, 844 F.3d 424, 430 (4th Cir. 2016).  Section 4312 guarantees reemployment if the returning service member satisfies the criteria set forth in that section.  *Id.*; 38 U.S.C. § 4312(a)(1)–(3).  Section 4313 then sets forth the rights to which the service member is entitled upon reemployment, specifically, the right to reemployment in the same position previously held prior to the military leave.  38 U.S.C. § 4313(a)(1)–(4).

---

[3]    Neither party briefed the issue of standing.  Therefore, the Court will not address the issue.

The parties dispute whether Reserve schedule assignment is an inferior employment position to Line Holder schedules and whether Reserve assignment has lesser rights and benefits.  ECF Nos. 136 at 35; 150 at 40.  Defendants contend Plaintiff was reemployed in his same position as a turboprop Captain upon his return from military leave.  ECF No. 136 at 36.  Plaintiff does not dispute he was a turboprop Captain both before and after his military leave but argues the Reserve schedule assignment he received in July 2017 was an inferior status than Line Holder assignment.  ECF No. 150 at 39.

The applicable CBA defines "POSITION" as a "Pilot's classification as either a Captain or First Officer in an Equipment Type."  ECF No. 136 at 35.  The CBA describes a "DOWNGRADE" as occurring when a "Pilot is Reduced from his Seat as a Captain and is awarded as a First Officer."  *Id*.  Line Holder and Reserve Line refer to the type of schedule a pilot receives during a Bid Period, which is the "time frame in Calendar Days that coincides with a Pilot's schedule."  ECF Nos. 161 at 28, ¶ 53; 138-8 at 4; at 5; at 10.  Line Holder or line flying refers a pilot who is assigned specific trips during the Bid Period.  ECF Nos. 161 at 28, ¶ 53; 138-8 at 7.  Reserve Line or reserve flying refers to pilots who are on call for flight assignments.  *Id*.  The type of schedule a pilot receives is based on seniority and bidding preferences.  ECF No. 161 at 28, ¶ 54.

Pilots submit their bidding preferences (e.g., a preferred location, specific

days off, specific flights, etc.) in advance of the next Bid Period using Defendant's Preferential Bidding System ("PBS"). *Id*. at 29, ¶ 55.  The PBS scheduler then creates a flight schedule for each pilot by taking into account each pilot's preferences and any known absences. *Id*. at ¶ 56.  If the PBS scheduler can build a schedule for a pilot with at least 70 combined hours (actual flight hours and virtual credit hours), the pilot is assigned Line Holder status.  ECF No. 136 at 34.  If the PBS scheduler cannot build a schedule with at least 70 combined hours, the pilot may be assigned Reserve status.  *Id*.  Pilots can also bid to take Reserve status during the bidding process.  ECF No. 161 at 53, ¶ 96.

Defendant's Virtual Credit Policy provided pilots who needed to take leave, whether for military duty or otherwise, with 2.45 hours of Virtual Credit to count toward the combined flight hours.  *Id*. at 56, ¶ 97.  Alternatively, pilots could adjust their assigned schedule to accommodate absences by trading with other pilots or through an open system that allowed pilots to pick up or drop trips, as necessary.  *Id*. at 30, ¶ 57.

Generally, USERRA supersedes a CBA that limits or eliminates any rights provided by USERRA.  *See* 38 U.S.C. § 4302.  However, to the extent a CBA does not directly contradict USERRA, the CBA should be considered when determining an employee's appropriate reemployment position.  *Hogan v. United Parcel Serv.*, 648 F. Supp. 2d 1128, 1142–43 (W.D. Mo. 2009) (citing *Fishgold v. Sullivan*

*Drydock & Repair Corp.,* 328 U.S. 275 (1946)).  In fact, the regulations

contemplate CBAs when analyzing whether a reemployment position includes the

same seniority, status, and rate of pay.  20 C.F.R. § 1002.193(a).  In relevant part,

the regulations state, "[t]he seniority rights, status, and pay of an employment

position include those established (or changed) by a collective bargaining

agreement, employer policy, or employment practice."  *Id.*  The parties here do not

argue the CBAs directly contradict USERRA; therefore, they are relevant

considerations.

The parties dispute the relative merits of being assigned Line Holder or

Reserve schedules.  Plaintiff argues Line Holder schedules are more predictable

and provide greater certainty of days off and were "usually provided a 74–80 hour

schedule in 2017 and thus made more money than reserve pilots."  ECF No. 150 at

40.  Defendant argues Reserve schedules provide a greater minimum pay guarantee

and more flexibility.  ECF No. 136 at 36.

The Court finds a pilot's assignment to a Reserve schedule is not a demotion

as contemplated by the statute and regulations.  Plaintiff generally retained the

same "opportunities for advancement, working conditions, job location, shift

assignment[,] . . . responsibility, and geographic location" upon reemployment.

*Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 183 (2d Cir. 2011).  Plaintiff was

a Captain of a turboprop aircraft when he left for military leave and he was

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 27

reemployed as a Captain of a turboprop aircraft when he returned.  ECF No. 161 at 56, ¶ 98.  The evidence shows Plaintiff did not experience a significant change in job duties or responsibilities.  His pay remained the same based on the number of flight hours Plaintiff flew during a bid period.  Plaintiff does not allege he was forced to relocate, that his working conditions changed, or that he was denied opportunities for advancement.  Plaintiff's subjective preference for a certain flight schedule cannot overcome the evidence that he was reemployed in the same position he held prior to his military leave.  Thus, Defendants are entitled to summary judgment as to Counts I and III.

Plaintiff's arguments regarding loss of pay or loss of credit hours due to receiving a Reserve schedule are not relevant under §§ 4312 and 4313, which apply only at the instant of reemployment; Plaintiff's alleged damages are better addressed under § 4316, which applies to actions or conditions after successful reemployment.  *Lisdahl v. Mayo Found. for Med. Educ. & Rsch.*, 698 F. Supp. 2d 1081, 1104 (D. Minn. 2010).

### B.    Count II

Defendants seek summary judgment as to Count II on the grounds that the benefit Plaintiff seeks—Line Holder assignment—is not a seniority-based benefit under the statute and because he was not disadvantage by Horizon's Virtual Credit policy.  ECF No. 136 at 37.  Plaintiff argues Line Holder assignment is a seniority-

based benefit because it provides a greater minimum pay guarantee and a more predictable schedule, which is not provided to Reserve Line assignments. ECF No. 150 at 42.

Section 4316 requires that employees who are reemployed following military service must be provided the same "seniority and other rights" that the employee was provided prior to the military service, plus any additional "seniority and other rights and benefits" the employee would have attained had the employee been continuously employed. 38 U.S.C. § 4316(a). USERRA defines "seniority" as "longevity in employment together with any benefits or employment which accrue with, or are determined by, longevity in employment." 38 U.S.C. § 4303(12). The USERRA regulations similarly define a "seniority-based right or benefit" as "one that accrues with, or is determined by, longevity in employment." 20 C.F.R. § 1002.212.

The regulations set forth three factors to consider when assessing whether a right or benefit is seniority-based: (1) whether the right or benefit is a reward for length of service rather than a form of short-term compensation for work performed; (2) whether it is reasonably certain the employee would have received the right or benefit had the employee remained continuously employed during the military service; and (3) whether it is the employer's custom or practice to provide

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 29

1  or withhold the right or benefit as a reward for length of service.  *Id.*  A CBA is not

2  controlling if the employer's practice or custom differs from the written policy.  *Id.*

3       Prior to the enactment of USERRA, the Supreme Court analyzed seniority-

4  based rights and benefits under the predecessor statutes and indicated the

5  determination of a whether right or benefit was seniority-based was best assessed

6  by understanding the "true nature" of the benefit rather than looking only to an

7  employee's longevity with an employer.  *Hoefert*, 438 F. Supp. 3d at 735 n.7

8  (citing *Alabama Power Co. v. Davis*, 431 U.S. 581, 592 (1977)).  In that context, if

9  the "true nature" of the benefit is a future-oriented longevity benefit, it is seniority-

10  based.  *Id.*  For example, a pension plan that is tied to an employee's longevity

11  with a company can be viewed as "an exchange of financial security for an

12  employee's long-term commitment to an employer."  *Id.*  If it is a backward-

13  looking compensation for work already performed, like vacation accrual, it is not

14  seniority-based because those benefits "do not incentivize longevity of

15  employment, but rather compensate for . . . the effort an employee has expended in

16  the past."  *Id.*; *see also Huhmann v. Fed. Express Corp.*, 874 F.3d 1102, 1111 (9th

17  Cir. 2017) (finding a signing bonus for a new collective bargaining agreement was

18  a seniority-based benefit because the award amount was determined by an

19  employee's longevity with the company).

20       Here, the parties dispute whether the assignment of Line Holder was a

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 30

seniority-based benefit.  The Court finds the "true nature" analysis helpful, despite

its application under the USERRA predecessor.  As previously discussed,

Defendant assigns pilot schedules using the monthly PBS scheduler.  ECF Nos.

161 at 49, ¶ 91; 138-8 at 24.  Several weeks prior to the issuance of schedules,

pilots submit their schedule preferences, including any known absences.  ECF No.

161 at 29, ¶ 55.  Pilots are then assigned to a Reserve or Line flying schedule based

on their availability to fly during a Bid Period, as indicated by their bidding

preferences, and their seniority with the company.  *Id*. at 50, ¶ 92.  Turboprop

pilots are assigned to Line Holder schedules if the PBS system can create a flight

schedule with at least 70 credit hours.  *Id*. at 53, ¶ 96.  If the PBS system cannot

create a schedule with at least 70 credit hours, a turboprop pilot is assigned to

Reserve flying.  *Id*.  A pilot's seniority, calculated from the first calendar day a

pilot reports for initial ground school training, contributes to a pilot's ability to bid

for certain schedules.  *Id*. at 50, ¶ 92; ECF No. 150-9 at 3.

Based on the evidence, the true nature of an assignment to a Line Holder

schedule is based on a work requirement, not seniority.  While a pilot's seniority is

a contributing factor to the bidding process and subsequent assignment, there is no

evidence to suggest a particular schedule is awarded as a financial incentive in

exchange for a pilot's long-term commitment to employment with Defendant.

Rather, the determinative factor is whether a pilot is able to meet the minimum 70

credit hour requirement for Line Holder status. Notably, a pilot's schedule as either a Reserve or Line Holder is not permanent but subject to adjustment for each Bid Period based on the pilot's availability, which supports a finding that the schedules are based on a work requirement. *See* ECF No. 138-8 at 22–39.

Moreover, pilots can adjust their schedules once they are issued by adding or dropping trips, as necessary, to meet the minimum requirement or to accommodate a leave of absence. ECF No. 161 at 30, ¶ 57. For example, Plaintiff took military leave in June, July, September, and October 2017. *Id*. at 58, ¶ 103. He was assigned a Reserve schedule in July 2017 but was able to pick up additional flights in the other months to achieve the minimum number of hours required for Line Holder assignment. *Id*. Thus, the award of a Line or Reserve schedule is based on the ability to complete the requisite amount of work, which supports the conclusion that the award of a particular schedule is not a seniority-based right or benefit. *See id*. at 53, ¶ 96.

Considering the factors set forth in the regulations also supports a finding that the assignment of Line Holder is not a seniority-based benefit. Plaintiff claims the first factor is satisfied because he does not seek compensation for hours worked, but rather the "rights and benefits" to which he is entitled, specifically the higher in-practice pay guarantee of 74–80 hours and the more predictable schedule. ECF No. 150 at 42. However, as with the assignment of Line Holder itself, there is

no evidence to suggest the Line Holder minimum pay guarantee, whether 70 hours

or 74–80 hours, and the more predictable schedule are awarded based on a pilot's

longevity with the company.  Rather, these "rights and benefits" are merely

characteristics of the Line Holder schedule.  Moreover, there is evidence to suggest

a pilot's assignment to a particular schedule may also be more subjective rather

than an objective award based on length of service.  *See* ECF No. 161 at 51–52, ¶

94.

        As to the second factor, Plaintiff does not specifically argue, or offer any

evidence, that he was "reasonably certain" to achieve Line status had he not taken

military leave.  Rather, Plaintiff argues he was required to work on his days off or

to take longer trips in order "to maintain my monthly minimum pay guarantee for

Regular Line Holders."  ECF Nos. 150 at 43; 73-22 at 3, ¶ 6.  First, Plaintiff's

argument implies he is entitled to the minimum pay for Line Holders, which

mischaracterizes any minimum pay guarantee outlined in the CBA.  The CBA

provides that a turboprop Line pilot who is available to fly for an entire Bid Period

will be guaranteed a minimum 70 credit hour pay, while a turboprop Reserve pilot

who is available to fly for an entire Bid Period will be guaranteed a minimum 73

credit hour pay.  ECF No. 138-8 at 12.  A pilot is entitled to the Line Holder

minimum pay guarantee *if* a pilot is assigned to that flight schedule; a pilot is not

otherwise guaranteed, much less entitled to, the Line Holder minimum pay

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 33

guarantee.  ECF No. 161 at 53, ¶ 96.  Plaintiff's argument regarding the higher in-practice pay guarantee of 74–80 hours is not relevant to the inquiry; if Plaintiff cannot achieve the 70-hour minimum for Line Holder, he is not entitled to the Line Holder minimum, regardless of the in-practice amount.

Second, even if Plaintiff had to fly on his days off to make up for lost hours, the Virtual Credit policy allowed Plaintiff to average fewer hours per day to make up those losses.  ECF No. 136 at 38–39.  Additionally, the Virtual Credit policy did not deny Plaintiff those benefits because Plaintiff did, in fact, receive Line Holder status for three out of the four months when he took military leave by making up the lost hours.  ECF No. 161 at 58, ¶ 103.  Thus, it is difficult to see how Plaintiff was harmed by the application of the Virtual Credit policy.

Regarding the third factor, Plaintiff claims Defendant withholds the rights and benefits (i.e., the Line Holder minimum pay-guarantee and predictable schedule) from pilots placed on Reserve status.  ECF No. 150 at 42.  Plaintiff's contention is not supported by the evidence.  Defendant does not "withhold" the Line Holder minimum pay guarantee or more predictable schedules from Reserve Status pilots; again, pay and flight days or routes are simply characteristics of a particular schedule assignment.  Schedules are primarily allotted based on a pilot's availability to perform work within a Bid Period, not a pilot's length of service with Defendant.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 34

1    Finally, the Court is unpersuaded by Plaintiff's letter from the Department of

2    Labor ("DOL") concluding that Defendant's Virtual Credit policy violated

3    USERRA, and that Plaintiff was entitled "to damages at his premium rate."  ECF

4    Nos. 150 at 43–44; 73-25 at 3.  The investigator's legal conclusions are not

5    supported by the evidence nor are they supported by the purpose of USERRA.  *See*

6    20 C.F.R. §§ 1002.7(a) ("USERRA establishes a floor, not a ceiling, for the

7    employment and reemployment rights and benefits of those it protects.");

8    1002.7(c) (". . . USERRA does not require an employer to pay an employee for

9    time away from work performing service . . .").  Moreover, the DOL does not have

10   authority to enforce compliance with USERRA.  20 C.F.R. § 1002.290.  Rather, if

11   a complainant's dispute with his or her employer cannot be resolved by the DOL

12   after it concludes its investigation, the complainant may then initiate his or her own

13   civil action in district court.  38 U.S.C. § 4323(a)(3); *see also Int'l Longshore &*

14   *Warehouse Union v. Solis*, No. C 11-1939 SI, 2011 WL 3667474, at *1 (N.D. Cal.

15   Aug. 22, 2011).

16       The "notes and conclusions of a single USDOL investigator" contained in an

17   investigative letter do not rise to the level of an opinion letter or policy statement

18   issued by the agency.  *Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1191

19   (D. Colo. 2012).  Therefore, Plaintiff's DOL letter is not entitled to any deference.

20   The investigation letter outlines the relief to which the DOL believed Plaintiff was

1   entitled, including a recalculation of Plaintiff's military leave of absence during

2   June and July 2017 at 3.0 credits per day or a 4.2 daily minimum but not less than

3   the value of trips dropped for those months, and $3,190.14 in pay differential at

4   150% "as if he had picked the time up as overtime or 'premium pay'."  ECF No.

5   73-25 at 3.  This is precisely the type of compensation and differential pay the

6   DOL expressly does not require employers to provide.  *See* 70 Fed. Reg. 75246-01,

7   75,292 (Dec. 19, 2005) (to be codified at 20 C.F.R. pt. 1002) ("employees absent

8   from employment for military service are not required to be compensated by their

9   civilian employer during that service"); *id*. at 75,249 ("The term 'differential pay'

10   refers to payments by employers to their employees absent to perform military

11   service, and this pay is neither required by nor addressed in USERRA.").

12       Granting Plaintiff an increased recalculation and "premium pay" would

13   effectively allow Plaintiff to earn double income for his military service from both

14   the United States military and Defendant.  USERRA requires only equal, but not

15   preferential treatment of employees who take military leave.  *Crews v. City of Mt.*

16   *Vernon*, 567 F.3d 860, 865 (7th Cir. 2009).  Thus, Plaintiff is not entitled to

17   compensation from Defendant beyond what is already provided by the Virtual

18   Credit policy.

19       Based on the foregoing, the Court finds there are no genuine issues of

20   material facts as to whether the assignment of Line Holder status is a seniority-

based right or benefit.  No reasonable fact finder could conclude the assignment of a pilot's schedule, based primarily on availability to fly in a Bid Period, was anything other than a bona fide work requirement.  Therefore, Defendants are entitled to summary judgment as to Count II.

## IV.    Liquidated Damages

Defendants seek summary judgment on Plaintiff's claim for liquidated damages.  ECF No. 136 at 40.  Plaintiff contends there is sufficient evidence to support a finding that Defendants willfully violated USERRA.  ECF No. 150 at 44. A court may require an employer to pay liquidated damages if the court determines the employer willfully failed to comply with the USERRA provisions.  38 U.S.C. § 4323(d)(1)(C).  Having determined Defendants did not violate the USERRA provisions at issue, Plaintiff's arguments for liquidated damages are moot. Defendants are entitled to summary judgment on Plaintiff's claim for liquidated damages.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 136) is **GRANTED**.

2. The parties remaining motions are **DENIED** as moot; the trial and all other hearings and deadlines are **VACATED** as moot.

1     The District Court Executive is directed to enter this Order, enter Judgment

2  for Defendants, furnish copies to counsel, and **CLOSE** the file.

3     **DATED** May 24, 2021.



THOMAS O. RICE
United States District Judge